UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Ron Yary, Kenneth D. Resnick, Marion L. Resnick individually and as trustees of the Marion L. Resnick, Revocable Trust created on September 7, 1995, and Irving Braverman<br><br>          Plaintiffs,<br><br>     v.<br><br>Stuart A. Voigt<br><br>          Defendant. | Court File No. _____<br><br><br><br>**Complaint<br>and Jury Demand** |

Plaintiffs, for their Complaint against Defendant, state and allege as follows:

## INTRODUCTION

In this case, the Defendant, Stu Voigt, knowingly and fraudulently induced close friends to make investments that benefited him financially but were contrary to the interests of the investors.  Marion Resnick was 89 years old and Irv Braverman was 86 years old when each lost their life's savings and investments after relying on Defendant Voigt's untrue or misleading statements and false promises.  Ken Resnick, one of Voigt's closest friends, also lost everything and Ron Yary, another of Voigt's close friends and former Minnesota Viking teammate, lost his entire investment.  Defendant Voigt

1

repeatedly told his friends that the investments, which turned out to be high-risk

mezzanine lending, carried no risk and that he personally guaranteed them.  Relying on

Voigt's advice and promises, Ken and Marion Resnick and Irv Braverman invested every

last penny with Voigt.  Ron Yary would only invest if Voigt personally guaranteed it.

Each person lost their entire investment – and with devastating consequences to three of

the most unsuspecting investors.  Plaintiffs bring this action for fraud and breach of

contract against Stu Voigt to recover their lost investments.

## PARTIES

1.      Plaintiffs Kenneth D. Resnick is an individual who resides in the

Minneapolis / St. Paul metropolitan area.  He was an announcer and television host for

professional wrestling and other sports programs.  He serves as a Commissioner on the

Minnesota Amateur Sports Commission and is involved extensively with charities and in

community service.  He suffers from keratoconus, a degenerative condition that causes

structural changes in the cornea, and has had three cornea transplants as well as a number

of other eye surgeries.  His condition and eye sight continues to worsen.

2.      Plaintiff Marion L. Resnick is an individual who resides in the Minneapolis

/ St. Paul metropolitan area.  She is a retired registered nurse and nursing home

administrator, and the mother of Ken Resnick.  During the period relevant to this

Complaint, she was 84 – 89 years old.  She currently is 92 years old and in frail health.

Plaintiff Marion L. Resnick Revocable Trust (the "Trust") was created on September 7,

1995 under the laws of the State of Minnesota.  Marion and Ken Resnick are the sole trustees.  Marion Resnick and the Trust are referred to herein collectively as "Marion Resnick."[1]

3.      Plaintiff Irving Braverman is an individual who resides in the Minneapolis / St. Paul metropolitan area.  He leased and operated drive-in movie theaters before retiring.  He has worked as a ticket taker in a Twin Cities movie theater for the last seven years.  During the period relevant to this Complaint, he was 80-83 years.  He currently is almost 86 years old.

4.      Plaintiff Anthony R. Yary ("Ron Yary") is an individual who resides in the Murrieta, Californian area.  He played football for the Minnesota Vikings from 1968 to 1981 and is a member of the Pro Football Hall of Fame.

5.      At all times relevant herein, Plaintiffs, as a direct result of the personal solicitations and inducements of Defendant, invested in Assured Financial, LLC ("Assured") and Hennessey Financial, LLC ("Hennessey") the respective amounts and at the respective times set forth herein below:

---

[1] As described in detail hereinbelow, the Trust is listed as the borrower for all investments referenced in this Complaint except for one debenture dated February 6, 2006 that, apparently by mistake, lists Marion Resnick individually as the borrower.  That debenture was superseded by a promissory note dated January 9, 2007 naming the Trust as the borrower.

| NAME | NOTE | AMOUNT | DATE | ENTITY |
|---|---|---|---|---|
| **1. Kenneth Resnick** | | $75,000 | June 3, 2002 | Assured |
| | | 8,000 | June 30, 2002[2] | Assured |
| | 070104 | $17,000 | Nov. 1, 2004 | Hennessey |
| | 070104 | $5,000 | Oct. 28, 2005 | Hennessey |
| | 051202 | $10,000 | Dec. 12, 2005 | Hennessey |
| | 070104 | $30,000 | Dec. 12, 2005 | Hennessey |
| | 070104 | $6,000 | Dec. 1, 2006 | Hennessey |
| | 051202 | $1,000 | Dec. 11, 2006 | Hennessey |
| | 070104 | $5,000 | Dec. 11, 2006 | Hennessey |
| | 070104 | $15,000 | Jan. 9, 2007 | Hennessey |
| Principle Total: | | $172,000 | | |
| | | | | |
| **2. Marion Resnick** | | $200,000 | June 3, 2002 | Assured |
| | | $100,000 | 2003-2004[3] | Assured |
| | 070105 | $100,000 | Nov. 1, 2004 | Hennessey |
| | 070105 | $100,000 | Oct. 11, 2005 | Hennessey |
| | 051002 | $10,000 | Oct. 19, 2005 | Hennessey |
| | 051002 | $10,000 | Nov. 16, 2005 | Hennessey |
| | 070105 | $50,000 | Nov. 16, 2005 | Hennessey |
| | 070105 | $15,000 | Jan. 9, 2007 | Hennessey |
| Principle Total: | | $585,000 | | |
| | | | | |
| **3. Ron Yary** | 031002 | $100,000 | Jan. 28, 2004 | Hennessey |
| | | | | |
| **4. Irving Braverman** | 060903 | $135,000 | Sep. 12, 2006 | Hennessey |
| | 060903 | $65,000 | Oct. 12, 2006 | Hennessey |
| Principle Total: | | $200,000[4] | | |

---

[2] Ken Resnick subsequently transferred the $83,000 note from Assured to Hennessey and received an Amended Promissory Note for that amount plus and additional principle investment of $17,000 on November 1, 2004.

[3] The exact date of her additional $100,000 principle investment in Assured is not known. Marion Resnick transferred the $300,000 note from Assured to Hennessey and received an Amended Promissory Note for that amount on Oct. 1, 2004, which references a transferred note for $300,000 issued by Assured.

[4] The investments of principle described in the debentures are rounded numbers that equal the total investment of $200,000 and described in detail herein below.

As of July 2, 2008, Plaintiffs' principle investments were consolidated in Hennessey promissory notes or debentures as follows:

| Marion Resnick | $585,000 (two loans: $565,000 and $20,000) |
| Kenneth Resnick | $172,000 (two loans: $161,000 and $11,000) |
| Ron Yary | $100,000 |
| Irving Braverman | $200,000 |
| **Total** | **$1,057,000** |

6.      At all times relevant herein, Plaintiffs, as a direct result of the advice and representations of Defendant, signed subscription agreements with Jaguar Financial Corporation ("Jaguar") and exchanged their Hennessey promissory notes and debentures for shares of Jaguar stock.  As of July 2, 2008, the total amount (principle and accrued interest) owing to each Plaintiff as calculated by Hennessey in preparation for Plaintiffs' exchange of promissory notes and debentures for shares in Jaguar is as follows:

| Marion Resnick | $611,196.87 |
| Kenneth Resnick | $181,153.07 |
| Ron Yary | $100,000.00[5] |
| Irving Braverman | $206,049.32 |
| **Total** | **$1,098,396.26** |

7.      Defendant Stuart A. Voigt is an individual who resides in the Minneapolis / St. Paul metropolitan area of Minnesota.  Voigt played football with Minnesota Vikings from 1970 – 1981 and was a teammate of Plaintiff Ron Yary.  From 1981 – 1989, he was a color commentator on Vikings radio broadcasts.  At all times relevant herein, Defendant was an investor and lender to Assured and Hennessey and held substantial

---

[5]  Hennessey/Jaguar failed to add the accrued interest to the total.

investments in both entities as set forth herein below.  He was Chairman of the Board of

Assured and a member of the Financial Advisory Board of Hennessey.  At all times

relevant herein, Defendant acted as a sales agent for Assured and Hennessey who

personally solicited and induced Plaintiffs to invest in Assured and/or Hennessey.

Defendant held himself out to Plaintiffs as a successful businessman and sophisticated

investor, with an extensive background in real estate an d banking.  A number of business

directories and bank websites identify Defendant with the title "investor" or "real estate

investor."  He has a Masters of Business Administration from the University of

Wisconsin.  During the period relevant to this complaint, he was the Chairman of the

Board of First Commercial Bank, a member of the Board of Directors of Bank Vista and

President of RAMCO Real Estate.

## JURISDICTION AND VENUE

8.      The above-entitled Court has jurisdiction over this lawsuit pursuant to

Section 22(a) of the Securities Act of 1933 ("Securities Act") (15 U.S.C. § 77v(a)),

Section 27 of the Securities and Exchange Act of 1934 ("Exchange Act") (15 U.S.C.

§ 78aa), and the doctrine of pendent jurisdiction.

9.      Venue is proper in this District as Defendant and three of the Plaintiffs

reside in this District, Defendant conducted business within this District, and the conduct

of Defendant that is alleged as a basis for Plaintiffs' Complaint herein occurred in this

District.

## FACTUAL ALLEGATIONS

### Defendant's Relationship with Assured and Hennessey

10.     Upon information and belief, Defendant began lending money to Jeffrey Gardner in 1992 or 1993 for individual real estate transactions.  Defendant would provide the initial financing for the purchase of lots for resale or for building for resale.

11.     Gardner incorporated Assured Financial, LLC, based in St. Paul, Minnesota, in 1998.  According to Assured's Business Plan, Assured would provide financing to companies engaged in residential building construction and land development in the greater Minneapolis / St. Paul Area and subsequently in other regional markets.  Assured would engage only in secured lending.  According to the Business Plan, profits from residential construction and land development lending would be substantial as funds are generally loaned at an interest rate 2 to 4 points above the cost of borrowing.  Assured's Summary Sheet, dated August 9, 1998, forecasted interest rates of 18% - 22%.  Assured's Private Placement Memorandum, dated September 4, 1998, states that Assured was offering 666,667 Class A shares for a total of $3,000,000.  The redemption date was December 31, 2003.  According to the Private Placement Memorandum, the securities were offered pursuant to exemptions from securities registration requirements.  The Class A Units were purportedly offered and sold only to "'accredited investors,'" as the term is defined in Rule 501 of Regulation D.  The securities in fact were not registered and upon information and belief were sold to a number of unaccredited investors, in addition to Plaintiffs Marion and Ken Resnick and

7

Braverman.

12.     The Private Placement Memorandum states in several places in bold capital letters that these securities are "**HIGHLY SPECULATIVE, INVOLVE A HIGH DEGREE OF RISK AND IMMEDIATE SUBSTANTIAL DILUTION, AND SHOULD BE PURCHASED ONLY BY PERSONS WHO CAN AFFORD TO LOOSE THEIR ENTIRE INVESTMENT**."  The memorandum also contains a three-page section describing the extremely risky nature of the investment.  Upon information and belief, Assured was mostly comprised of large investors.  Defendant read and understood this document and many others containing similar warnings regarding the high degree of risk associated with these investments.  Defendant knew about and understood the high degree of risk associated with investing with Assured.

13.     From 1999 to 2002, Defendant invested heavily in Assured and entered into lending arrangements with Assured secured, upon information and belief, by personal guaranties from Gardner.  Upon information and belief, Defendant loaned at least $950,000 to Assured during this period and at one point was Assured's largest investor.  Defendant's loans to Assured, upon information and belief, resulted in returns of 10%-20%.  Defendant also held membership units in Assured and received regular distributions from Assured.

14.     Defendant was Chairman of the Board of Assured during the period relevant to this Complaint.  He was also Chairman of the Board for First Commercial Bank.  In 2002, Assured bought out Defendant's interest in Assured.  He received a

8

promissory note, which upon information and belief was for the sum of $1,300,000 at a

high rate of interest and matured in 8 years.  Defendant upon information and belief

received regular payments on the note throughout the period relevant to this Complaint

and remained Chairman of the Board of Assured.

15.     Defendant's personal financial statement dated April 2, 2004 states that

Defendant received income of $50,000 per month from Assured.  It states that his

investment in Assured was $2,900,000 in 2000 and claims a 2004 market value of was

$4,900,000.

16.     At all times relevant herein, Defendant had access to and possessed

confidential financial, business and operational information regarding Assured, which

was not available to Plaintiffs or to the general public.  He was able to obtain this

information through his roles as a major investor, Chairman of the Board and Board

Member and through his close professional and personal relationships with Gardner,

other officers, employees and professionals retained by Assured, including but not

limited to David Wachal, Dennis Richardson, Rick Rogers, David Moran and Bob

Tautges.

17.     Defendant benefited financially from Assured's success. Upon information

and belief, Defendant received monthly distributions as an Assured shareholder.  He also

received regular interest payments on his loans to Assured.

18.     In order for Assured to be profitable, it needed a constant stream of capital

to continue to provide financing for real estate developments at above market interest

rates.  Defendant personally solicited investments from Plaintiffs and others to help satisfy Assured's capital needs.  Defendant received commissions, "finder's fees" or other pecuniary benefit for selling or soliciting the purchase of debentures or otherwise causing investors to loan money to or invest in Assured.  Upon information and belief, Defendant not only received commissions for new investors, but also received commissions for subsequent investments of new principle or when investors chose to renew or "roll-over" their principle investments when their notes came due.

19.     Defendant received commissions (upon information and belief of 2% or more) for each of the initial principle investments he solicited from Plaintiffs.  Upon information and belief, he also received commission in the same or similar amount for Plaintiffs' subsequent investments of new principle and or reinvested principle.  Defendant never revealed to Plaintiffs that he received any commissions or other types of payment as a result of his solicitation of Plaintiffs' investments or Plaintiffs' additional and "roll over" investments in Assured.

20.     Jeffrey Gardner incorporated Hennessey Financial, LLC, based in St. Paul, Minnesota, on November 19, 1999.  Hennessey's Private Placement Memorandum, dated October 7, 2005, describes Hennessey as engaged in mezzanine financing[6] with short-term leveraged positions in a large number of properties.  It further states that debentures may be purchased by "accredited investors" as defined in regulations under the Securities Act of 1933 and up to 35 non-accredited investors.  The Private Placement Memorandum

---

[6] A mezzanine real estate loan is a loan in which the lender's security interest in the real estate collateralizing the loan is subordinate to a more senior lender.

states in bold type: "**An investment in the Debentures offered by this memorandum is highly speculative.  Investments should only be made by persons who can afford the loss of their entire investment.**"  The memorandum contains additions warnings of the high risk associated with this investment.  Defendant read this document and others containing similar warnings regarding the high degree of risk associated with these investments.

21.    Hennessey had hundreds of investors and a higher interest rate to investors than did Assured.  At one point it had $130 million in capital and received a substantial amount of credit from Textron Financial Corporation, which became its primary lender.  Subsequently, Capital Solutions Monthly Income Fund, L.P. f/k/a as Hennessey Financial Monthly Income Fund, L.P. ("the Fund") became its primary lender.  Its sole business was to make mezzanine real estate loans to Hennessey, the sole borrower.  Most of Hennessey's real estate loans were provided to developers affiliated with Hennessey. were provided

22.    Hennessey initially provided investors with promissory notes but later issued primarily subordinated debentures or sub-debt agreements.  Defendant, on information and belief, only received promissory notes and never entered into a sub-debt agreement with Hennessey.  Interest rates varied by investor.  Upon information and belief, Defendant's lending to Hennessey resulted in at least a 15% return.

23.    Defendant owned a substantial equity interest in Hennessey during the period relevant to this Complaint.  Hennessey's website and publically filed documents

11

listed Defendant as Chairman of the Board of Assured and a member Hennessey's

Financial Advisory Board. He also invested in a number or entities or development

projects controlled by Gardner.

24. By October, 31, 2003 Defendant owned $1 million (50,000 units) of

Hennessey Class C membership units earning a priority rate of return of 15%. On

January 16, 2004, Defendant and Gardner agreed to an investment alternative in a manner

that provided above-market rates of return with some liquidity provisions. Gardner in

turn contributed investment proceeds into Hennessey as equity capital. Defendant loaned

Gardner $500,000 at 15% interest and received a Promissory Note and Guaranty from

Gardner, which was invested in the form of a capital contribution from Gardner into

Hennessey Class A membership units. Upon information and belief, Defendant and

Gardner executed this transaction because Defendant had already loaned Hennessey the

maximum amount permitted.

25. Defendant's personal financial statement dated April 2, 2004 lists a

monthly income of $1,000 from Hennessey/Shenandoah and an initial investment of

$1,000,000 with a market value of $1,200,000. Defendant also listed an initial

investment of $500,000 with Gardner/Hennessey with a market value of $550,000. He

listed the total market value of his investments in partnerships and LLCs as $10,425,000.

26. At all times relevant herein, Defendant had access to and possessed

confidential financial, business and operational information regarding Hennessey, which

was not available to Plaintiffs or to the general public. He was able to obtain this

12

information through his roles as a major investor, Hennessey Financial Advisory Board

Member, Assured Chairman of the Board, and through his close professional and

personal relationship with Gardner, other officers, employees and professionals retained

by Hennessey, including but not limited to Jon Essen, Dean Engstrom, Todd Duckson,

Lawrence Neumann and Jeff DeYoung.  Defendant also was one of the original partners

with Gardner, Arlyce Richardson (wife of Dennis Richardson) in the Big Sandy Lodge &

Resort LLC in 2003.  Defendant, Gardner, the Richardsons and Todd Duckson had lake

homes in close proximity to one another in the area of the Big Sandy Lodge & Resort.

27.     On or about April 28, 2005, Hennessey switched its banking relationship

from Bremer Bank to First Commercial Bank, of which Defendant was Chairman of the

Board.

28.     Defendant benefited financially from Hennessey's success.  He received

monthly distributions as a Hennessey shareholder and regular, substantial interest

payments from his loans to Hennessey.

29.     As was the case with Assured, Hennessey needed a constant stream of

capital to continue to provide financing for real estate developments at above market

interest rates.  Defendant personally solicited investments from Plaintiffs and others to

help fulfill Hennessey's capital needs.

30.     Defendant received commissions, "finder's fees" or other pecuniary benefit

for selling or soliciting the purchase of debentures or otherwise causing investors to loan

money to or invest in Hennessey.  Upon information and belief, Defendant not only

received commissions for new investors, but also received commissions for subsequent investments of new principle or when investors chose to renew or "roll-over" their principle investments when their notes came due.

31.     Defendant received commissions (upon information and belief of 2% or more) for each of the initial principle investments in Hennessey he solicited from Plaintiffs.  Upon information and belief, he also received commission in the same or similar amount for Plaintiffs' subsequent investments of new principle and reinvested princple.  Defendant never revealed to Plaintiffs that he received any commissions or other types of payment as a result of his solicitation and inducement of Plaintiffs' investments or Plaintiffs' additional and "roll over" investments in Hennessey.

32.     Defendant knew about and understood the high degree of risk associated with investing with Hennessey.

### Defendant's Solicitation of Plaintiff Ken Resnick to Invest in Assured

33.     Since 1973 and at all times relevant herein, Ken Resnick and Defendant were very close personal friends.  At or around Ken Resnick's initial investments with Assured and throughout much of the period relevant to this Complaint, they typically saw each other every other day while working out at the same gym, socialized frequently and regularly celebrated holidays together.

34.     Ken Resnick was not a sophisticated investor.  He and his mother had the same financial advisor.  His investments were in an investment account at Piper Jaffrey and relied on his financial advisor to make the investment decisions.  He did not

14

participate in the day-to-day management of the investments.  The risk profile for the fund was designated as "moderate."  He did not have significant personal wealth.

35.     Ken and Marion Resnick understood Defendant to be a very successful businessman and a very sophisticated investor.  Defendant made known to Ken and Marion Resnick that he had extensive investment experience and success in the fields of real estate and banking.  Ken and Marion Resnick knew he has a Masters of Business Administration from the University of Wisconsin.  Defendant had informed Ken Resnick, who informed his mother, that he was Chairman of the Board of First Commercial Bank.

36.     In late April or early May 2002, Defendant, Ken Resnick and other friends had dinner at Ciao Bella restaurant in Edina.  A waitress brought the bill for dinner to the group and Defendant paid the entire bill, which was not his normal practice.  When Ken Resnick thanked Defendant for paying for the dinner and asked why he did it, Defendant responded: "I'm getting a great interest rate on $3 million so I guessed I can afford it." Defendant told Ken Resnick that he was Chairman of the Board of Assured and that he was receiving very high interest rates on loans to the company.  Defendant said that Assured was open to a small, select group of investors and required a minimum $50,000 initial investment.  The investors were receiving a 10% - 10.5% return.  Ken Resnick told Defendant that Assured sounded like an amazing investment opportunity.  He said that he thought he could make a $50,000 investment and asked Defendant, "Do you think they would let me in?"  Defendant replied, "I'll take care of you."  Defendant and Ken Resnick agreed to discuss the investment opportunity later.

37.     Over the next few days, Defendant personally solicited and induced Ken Resnick to invest with Assured.  Defendant held himself out as an insider who had control over and monitored the investment activities of Assured.  Based on these representations and Defendant's role as Chairman of the Board and major investor, Ken Resnick understood Assured to be "Defendant's company."  Defendant told Ken Resnick that Assured was a great company and a great, safe investment.  Ken Resnick asked Defendant how Assured could pay such high interest rates and Defendant provided an explanation based on economics.  He stated that Assured sought to attract a small, select group of investors who would not be involved in the daily operations by providing a high rate of return, which enabled Assured to obtain large bank loans for the purpose of significant real estate investments.  Defendant explained that groups like this were called "passive investors" and that the more money a company has from passive investors the more money it can borrow from banks.  Because passive investment was very important to a company like Assured, it paid above market interest rates.  Defendant stated that investments in Assured were "safe, secure and guaranteed."

38.     Defendant told Ken Resnick that "I can get you into Assured."  Ken Resnick understood that Defendant had the capability to "get [him] into Assured" because of Defendant's role as Chairman of the Board and as a significant investor in Assured.  Defendant told Ken Resnick that he would be able to look after his investment.

39.     Ken Resnick stated to Defendant that he intended to combine nearly all of his investment resources into the investment with Assured.  Defendant encouraged him to

make the investment and stated it would be safe and secure.  Ken Resnick relied on those

representations.

40.     Defendant also stated that he would personally guarantee Ken Resnick's

investment because he wanted Ken Resnick to "sleep like a baby and never have to worry

about it."  At all times relevant herein, Ken Resnick believed that Defendant was

personally guaranteeing his investments.  He believed that Defendant was willing to

guarantee his investment because he had inside knowledge into and control over

Assured's investments and business operations and that the investments carried no risk.

He believed that Defendant's willingness to personally guarantee his investment proved

that the investment was in fact was safe and secure.  Because of their close personal

friendship, he believed that Defendant, who had superior investment knowledge and

personal wealth, wanted to allay any of his concerns about the investment by

guaranteeing his investment in Defendant's company.  At all times relevant herein, Ken

Resnick believed that Defendant was doing him a significant favor solely to advance Ken

Resnick's interests and frequently thanked Defendant verbally and through other gestures

of appreciation.  At no time relevant herein did Ken Resnick know that Defendant

received a commission for or profited in any way directly from the initial investment and

subsequent investments Defendant brokered.

41.     Within one to two weeks of his initial meeting with Defendant at Ciao

Bella, Ken Resnick again met Defendant to discuss investing with Assured.  During this

period between meetings, he liquidated most of his investments in order to make the

17

initial investment with Assured.  Again, Defendant assured him that the investment was completely safe and secure.  Relying on that representation, as well as Defendant's position as Chairman of the Board of Assured, his access to investment information, his control over Assured's investment decisions and business operations, his status as a sophisticated investor, their long, close friendship and Defendant's personal guaranty, Ken Resnick individually agreed to invest with Assured.  He had Piper Jaffrey liquidate his investment portfolio and he wired $83,000 to Assured ($75,000 on June 3, 2002 and $8,000 on June 30, 2002).  In return, Ken Resnick received a Promissory Note from Assured for $83,000 at 10.5% interest *per annum* maturing in two years and Defendant's signed and notarized personal guaranty.

42.     Ken Resnick also received a personal guaranty signed by Jeffrey Gardner. It was not until he received the document that Ken Resnick learned that Gardner also was personally guaranteeing his loan to Assured.  He had invested in Assured solely because Defendant had vouched for the company and personally guaranteed the investment.

43.     Other than to get the account number for his wire transfer to Assured, Ken Resnick spoke only with Defendant about this investment and had no contact with anyone else associated with Assured.  Defendant's representations caused Ken Resnick to believe that the only way for him to get into the small group of select investors that comprised Assured was through Defendant.  (He and his mother, Plaintiff Marion Resnick, did not meet Gardner until an investors' meeting at Assured's office in Little Canada well after he and his mother had invested in Assured).  Defendant told Ken

18

Resnick that "I took care of you" after the investment transaction was complete.

44.    Defendant received a commission of at least 2% of the investment, which he did not disclose.

### Defendant's Solicitation of Plaintiff Marion Resnick to Invest in Assured

45.    Defendant also was a close personal friend with Ken Resnick's mother, Plaintiff Marion Resnick.  Defendant visited Marion Resnick often and she considered him to be like a son and a trusted friend to her as well as to her son.  Three or four times a year during the period relevant to this Complaint, Marion and Ken Resnick would get together with Defendant and his wife.  Marion Resnick gave Defendant's wife a diamond pin with special meaning because of her appreciation of their friendship and because she believed that Defendant created the investment opportunities that are the subject of this lawsuit for her and her son because of their close personal friendship.

46.    Marion Resnick was not a sophisticated investor.  She had her investments in resource management account at Piper Jaffrey and relied on her financial advisor to make all the investment decisions regarding her asset portfolio.  She did not participate in any of the day-to-day investment decisions.  The risk profile for the fund was designated as "moderate."  She did not have significant personal wealth.  She had worked hard to earn the money she had saved and invested later in life.  When Ken Resnick told his mother about the investment opportunity Defendant had presented to him, she asked him whether it made sense to invest in Assured as well.  She was 84 years old at the time.

47.    At the end of May or beginning of June 2002, Defendant agreed to review

her investment portfolio and to advise her as to whether it was properly invested.

Defendant picked up Ken Resnick and they went to Marion Resnick's apartment

together.  Marion Resnick gave Defendant a copy of her latest monthly statement, which

detailed the activity of her entire investment portfolio.  That portfolio included

investments such as stock in Ford Motors and Twin City Federal Bank and municipal

bonds.

48.     After reviewing Marion Resnick's statement, Defendant said that it was

"crazy for someone your age to have your money in the stock market – it should be in a

safe investment."  He also said that he did not understand why her broker put her in funds

with late maturity dates.  Marion Resnick would not have been aware that she had funds

with purported late maturity dates absent this statement from Defendant and relied on

Defendant's assessment that her investments were not suited to a woman of her age.

49.     Defendant advised Marion Resnick to invest in Assured.  He told her that

Assured would yield a greater return than what she was getting and was a safe and secure

investment.  He stated that she could "sleep like a baby" because she would never have to

worry about her principle again.  He also stated that he would personally guarantee her

investment and said "I'll watch it like a hawk."

50.     On the basis of Defendant' advice after reviewing her investment portfolio,

Marion Resnick agreed to invest $200,000 with Defendant in Assured.  She made this

and subsequent decisions to invest with Assured in reliance on Defendant's

representation to her that he was an experienced and successful investor who was

Chairman of the Board of Assured and had inside knowledge of and control over Assured's investments and business operations.  She also trusted him as a 30-year, close friend of her son Ken Resnick and a close friend of hers.  As a result of this trust and their friendship.  Therefore, she believed that he had her best interest in mind when he advised her to move her investment from the Piper Jaffrey account to Assured.

51.     Marion Resnick transferred $200,000 from her brokerage account to Assured on June 3, 2002.  In return, she received a Promissory Note for that amount at 10.5% interest *per annum* maturing in two years and a personal guaranty signed by Defendant.

52.     She also received a personal guaranty signed by Gardner.  Prior to receiving this guaranty, she had no knowledge that she would receive it.  She had invested in Assured solely because of Defendant's advice, encouragement and personal guaranty.

53.     Marion Resnick did not receive any written material from Defendant or anyone else describing the nature of her investment with Assured.  She did not receive oral or written warnings from Defendant or anyone else regarding the high level of risk associated with investments with Assured.  To the contrary, Defendant represented that the investment was without risk and that he personally guaranteed it.

54.     Marion Resnick subsequently invested another $100,000 in principle with Assured on the same term as the earlier note.  Prior to making that additional investment, Ken Resnick on behalf of his mother asked Defendant if it was advisable for her to invest

21

more money in Assured.  Defendant again reassured him that it was safe, secure and

guaranteed and advised her to make the investment.  Marion Resnick relied on

Defendant's representations and encouragement when she invested the additional

$100,000 in Assured.

55.     Defendant received a commission of at least 2% on each of her

investments.  Defendant did not reveal to her or to Ken Resnick that he would receive the

commissions.

### Defendant's Solicitation of Plaintiffs Ken and Marion Resnick to Invest in Hennessey

56.     In September 2004, Ken and Marion Resnick received a letter informing

them that they could either liquidate their investments in Assured or transfer them to a

new company, Hennessey, and receive higher interest rates.  A day or two after receiving

the letter, Ken Resnick asked Defendant about it.  Defendant told him that Assured was

being "shut-down" but that Hennessey was almost identical, with the same approach of

raising capital from a small group of select investors.  Defendant told Ken Resnick that

Hennessey offered a "much better deal."  He said that their investment strategy was

shifting away from residential real estate lending and Hennessey would focus on more

lucrative commercial real estate lending.

57.     Ken Resnick asked Defendant if he and his mother should transfer their

Assured investments to Hennessey.  Defendant told Ken Resnick that he also would be

investing heavily with Hennessey and was on its Financial Board of Advisors.  He said

that there was nothing to worry about and that the investments would continue to be safe,

secure and guaranteed.  Ken Resnick relayed Defendant's representations, advice and encouragement to his mother.  Relying on Defendant's representations that the investment was safe, secure and guaranteed, and on Defendant's advice that both he and his mother should transfer their Assured investments to Hennessey, Ken and Marion Resnick agreed to allow their investments with Assured to transfer to Hennessey.

58.     At the time, Ken Resnick had a principle amount of $83,000 invested with Assured.  He received a Promissory Note dated November 1, 2004 from Hennessey for the principle sum of $100,000 at 12% interest maturing in two years (Investment 070104).  The note included the principle amount of $83,000 from the previous Promissory Note issued by Assured and a new contribution of $17,000.

59.     Marion Resnick had a principle amount of $300,000 invested with Assured.  On October 1, 2004, Marion Resnick received a Promissory Note from Hennessey for the principle sum of $300,000 at 12% interest maturing in two years.  Hennessey identified this investment as Investment 070105.  The note states that the principle amount was transferred from the previous Promissory Note issued by Assured.  She also received a Personal Guaranty signed by Gardner.

60.     Marion Resnick made another investment of $100,000 dated November 1, 2004 and, upon information and belief, the previous note was amended only to reflect the increased principle of $400,000.  She received an Amended Promissory Note dated November 16, 2005 for $550,000 at 12% interest maturing in a little less than one year (October 1, 2006).  That note was comprised of the previous note and an additional

investment of $100,000 dated October 11, 2005 and $50,000 dated November 16, 2006.

61.     Ken Resnick talked with Defendant about each of these investments. Marion Resnick also frequently discussed these investments with Defendant.  In each and every case, Defendant encouraged Ken and Marion Resnick to make the investment and reassured them that the investment not only carried very little risk but that he also guaranteed them.

62.     In December 2006, Ken and Marion Resnick were informed that they could receive 13% interest if they increased their investments to a term of four years.  Ken Resnick asked Defendant if there was any additional risk associated with the longer maturity date.  Defendant responded that the investment itself was the same and it was absolutely safe.  He explained that "the longer we can count on having the money, the longer we know we can use it and that's why we give you a higher interest rate."  Ken Resnick relayed Defendant's statements to his mother.  Based on Defendant's representations and recommendation, she agreed to change her November 16, 2006 one-year $550,000 investment into a four-year investment of the same amount at 13% interest.

63.     However, rather than receiving a promissory note and personal guaranty as with all her previous investments, Marion Resnick received a subordinated debenture dated February 6, 2006.  Defendant did not inform Marion or Ken Resnick that the subordinated debenture was even less secure than a promissory note.  Neither Ken nor Marion Resnick noticed that she had not received a promissory note as they had in the

24

past or that the borrower was listed as Marion Resnick rather than the Trust.

64.     Less than a year later, Marion Resnick made an additional principle investment of $15,000 and received an Amended Promissory Note listing the Trust as the borrower dated January 9, 2007 for the principle sum of $565,000 at 13% maturing in four years and a personal guaranty signed by Gardner.  Again, Ken Resnick consulted Defendant before this investment and received the same assurances he had received regarding all of their previous investments.

65.     Ken Resnick also made a number of additional investments with Hennessey with Defendant's encouragement and assurances.  He received an Amended Promissory Note dated December 11, 2006 for the principle sum of $146,000 at 12% maturing in one year, comprised of the previous note and investments totaling $46,000 made from October 29, 2005 – December 11, 2006.  He received another Amended Promissory Note dated January 9, 2007 for $161,000 at 13% interest maturing in four years comprised of the previous note and an investment of $15,000.

66.     In the fall of 2005, Ken Resnick told Defendant that he and his mother each wanted to save money to buy a car.  He asked Defendant if they should make a new, separate investment of $10,000 each with Hennessey that would function like a high interest savings account.  He also asked if the $50,000 minimum requirement would bar such an investment.  Defendant encouraged him to make the investments, stating that there were only upsides and no downsides.  He told Ken Resnick: "Call Essen and tell him that you talked to me and it's alright."  Relying on Defendant's representations,

advice and encouragement, Ken and Marion Resnick each invested $10,000 in separate Hennessey investments.

67.     With respect to these smaller investments, Marion Resnick received a Promissory Note dated October 19, 2005 for the principle sum of $10,000 at 12% maturing in two years (Investment 051002).  She made an additional investment dated November 16, 2005 to that note and received an Amended Promissory Note dated November 16, 2005 for $20,000 at 12% maturing in two years.

68.     Ken Resnick received a Promissory Note for the principle sum of $10,000 dated December 12, 2005 at 12% interest maturing in 2 years (Investment 051202).  He added another $1,000 in principle investment and received an Amended Promissory Note date December 11, 2006 for $11,000 at 12% maturing in 1 year.

69.     Around the last week of November 2005, while working out together at the gym, Ken Resnick asked Defendant if he should cash in his Northwestern Mutual life insurance policies – one for the cash value of $22,863.32 and the other for $18,906.40 – and invest the money in Hennessey.  Defendant recommended that he sell the insurance policies and invest the money in Hennessey.  Ken Resnick then told Defendant that with that investment "everything I have" would be invested in Hennessey.  He again asked Defendant if he was sure that making the additional investment was wise and safe.  In response, Defendant made for the first time a statement he subsequently repeated when describing the Hennessey investments: "Short of a nuclear war, you have nothing to worry about.  And then what difference does it make?"

70.     Relying on Defendant's advice and encouragement, Ken Resnick contacted Mutual Life as soon as he got home from the gym and requested the paper work necessary to liquidate his two life insurance policies.  He received the checks for the full cash value of his life insurance policies approximately ten days later and invested $40,000 in Hennessey on December 12, 2005 ($30,000 to Investment 070104 and $10,000 to Investment 051202).

71.     After liquidating his life insurance policies, Ken Resnick told Defendant that he had liquidated all of his assets and withdrawn all of his savings, "except for the $10,000 I deposited in your bank (First Commercial Bank)," and invested the money with Hennessey.  Yet, Defendant did not caution him about the risk associated with mezzanine lending, investments with Hennessey or with concentrating all his resources in a single narrow investment type.  To the contrary, Defendant encouraged Ken Resnick to increase his investment in Hennessey and upon information and belief received commissions each time he did.

72.     Despite the fact that Marion Resnick was approximately 86 years old, Defendant in December 2005 and January 2006 advised and encouraged her to change her one-year $550,000 note at 12% interest that was due on October 1, 2006 to a four-year subordinated debenture dated February 6, 2006 to increase her interest rate by one percentage point.

73.     In October 2007, Ken Resnick told Defendant while working out together that the smaller notes he and his mother held separately for the purpose of saving for a

27

car (Investments 051002 and 051202) were due in the next months.  He told Defendant that he did not want to commit to another two-year promissory note as he planned to buy the car the following year.  He asked Defendant if it would be possible to leave the money in the investment for one more year at the current 12%.  If not, he told Defendant that he would put the money into a savings account when the note came due.  Defendant told Ken Resnick to call Essen, tell him that he and Defendant had talked, and that Essen would do whatever Defendant wanted.  Relying on Defendant's advice and encouragement, and his display of control over the investment and the company, Ken Resnick talked to Essen, who agreed to let both existing notes continue for another year without creating new promissory notes.  Hennessey continued to make interest payments after the maturity date of both note.

74.     By July 2, 2008, Marion Resnick had invested with Hennessey the total principle sum of $585,000 (Investment 070105, $565,000 and Investment 051002, $20,000).

75.     By July 2, 2008, Ken Resnick had invested with Hennessey the total principle sum of $172,000 (Investment 051202, $161,000, and Investment 070104, $11,000).

76.     Several times, he gave checks directly to Defendant.  Once, he hid $5,000 or $6,000 in cash under the floor mat of his car and gave it to Defendant after they finished working out.

77.     In making each investment, Ken and Marion Resnick relied on Defendant's

28

advice and encouragement.  He repeatedly told them that their investments in Hennessey were "safe, secure and guaranteed" and often said "You can sleep like a baby and never worry about you principle."  They believed that Defendant's personal guaranty was still in place and relied on that belief in continuing to invest in what they regarded as "Defendant's company."  They never received from Assured and Hennessey any printed information regarding the high level of risk of these investments.  At no time did Defendant reveal to Ken or Marion Resnick the true risk level associated with these investments.  To the contrary, Defendant repeatedly told them that there was *no* risk associated with the investments.  He repeatedly encouraged them to make investments knowing that they were concentrating their entire investment resources and almost all of their savings in this single, high-risk type of investment.  Defendant never informed Ken or Marion Resnick that he received a commission for each of their investments.

78.    In making each investment, they relied on his superior knowledge and experience as an experienced and successful investor as well as his intimate knowledge of the investment activity and financial condition of Assured and Hennessey.  They also relied on Defendant's representations and advice because they believed that he was a very close friend who put their interests ahead of his own.  Ken Resnick discussed with Defendant each and every investment decision he and his mother made with Assured or Hennessey and invested only after Defendant advised him to do so.

**Defendant's Solicitation of Plaintiff Ron Yary to Invest in Hennessey**

79.    Plaintiff Ron Yary and Defendant Stu Voigt became teammates and friends

29

when Defendant was drafted by the Minnesota Vikings in 1970.  They continued an active personal friendship from that time through the period relevant to this Complaint.

80.     Defendant represented himself to Yary as a sophisticated and successful investor.  As early 2002, Defendant told Yary that he was Chairman of the Boards of Assured and First Commercial Bank.  While participating in the Mike Ditka NFL Golf Tournament, Defendant gave Yary his business cards, which carried the titles of Chairman of the Board of Assured and Chairman of the Board of First Commercial Bank.

81.     In the summer of 2003, Yary was in the Twin Cities and met with Ken Resnick at Resnick's home.  During their conversation, Ken Resnick told Yary about his investment with Defendant, who was a friend they had in common.  Ken Resnick told Yary that Defendant had recommended that he and his mother invest in Defendant's company Assured and repeatedly told him that the investment was safe and secure, and that Defendant was personally guarantying the investment.

82.     Yary called Defendant within two months after his conversation with Ken Resnick regarding investing with Defendant.  In this and several other phone conversations between August 2003 and April 2004, Defendant personally solicited Yary to invest in Hennessey.  In their initial conversation in August 2003, Defendant told Yary that he was on the Board of Hennessey and that he was a major investor in the company. He stated that Hennessey was a good company and a very safe investment, and explained in general terms that Hennessey raised capital to lend to real estate developers.  He told Yary that Essen would contact him to discuss the details of investing in Hennessey.

30

83.     Yary and Essen spoke by phone in mid-August 2003 regarding investment opportunities with Hennessey.  Yary agreed to consider investing.  In a letter to Yary dated August 21, 2003, Essen referenced their phone conversation earlier that week and wrote: "Stu has been a beneficiary of our investment returns for many years and I'm glad to see that he continues referring new potential investors to us."

84.     Yary received a letter signed by Essen dated August 28, 2003 enclosing a copy of Hennessey's Private Placement Memorandum and its "unaudited financial statements as of July 31, 2003."  The letter stated: "Lately we have hesitated in handling out our PPM because the financial disclosures are stale.  However, the remaining information in the PPM is useful and remains current."

85.     Defendant and Yary spoke by phone in September 2003.  Yary said that he would consider investing $100,000 - $200,000 but only if Defendant personally guaranteed the investment and provided a financial statement to demonstrate he had sufficient means to honor the personal guaranty.  Defendant agreed that he would provide his personal financial statement for Yary to review and would personally guarantee his investment.

86.     Yary received a Subscription Agreement enclosed in a letter signed by Essen dated October 2, 2003.  The letter states the Essen is planning on receiving $200,000 from Yary around November 1, 2003.

87.     Based on Defendant's promises, Yary signed a Subscription Agreement dated October 28, 2003 and received a debenture from Hennessey dated November 4,

2003 for the principle sum of $200,000 at 12% interest, maturing in 5 years.  Yary did not

transfer the funds, however, because he had not yet received Defendant's personal

guaranty and personal financial statement.

88.     In a fax from Essen to Yary dated December 30, 2003 regarding the

pending investment, Essen wrote:

> Here is the standard Personal Guaranty that we use with
> investors.  Jeff Gardner has no problem signing this for your
> pending investment.  I would expect that Stu would also be
> willing to sign this as well.  Once you "approve" this
> agreement I will forward it to Stu so he can take a look at it.

89.     Yary called Defendant after receiving the fax.  Defendant again stated the

he would personally guarantee the investment.  Defendant told Yary that he had

personally guaranteed other people's investment many times and stated that he gives his

personal guaranty "whenever I'm asked to do it."  Defendant also told Yary that if he

wanted his money back at any time, all Yary had to do was write a letter to Hennessey

and Defendant personally would ensure that Yary received his principle investment and

any accrued interest.

90.     Yary asked Defendant if he would receive a commission if Yary made an

investment with Hennessey.  Defendant stated that he would not receive any commission

or finder's fee.  Based on Defendant's representations and contingent on the fulfillment

of Defendant's promises, Yary agreed to invest $100,000 with Hennessey.

91.     Yary's lawyer drew up a "Continuing Guaranty" for Yary based on the

Hennessey documents.  He signed another Subscription Agreement ("Final Subscription

Agreement") on January 27, 2004 and sent a check with the same date for $100,000 to

Hennessey.  Yary received a new debenture dated January 28, 2004, for the principle sum

of $100,000 at 12% interest maturing in 5 years.  Yary faxed a copy of the Continuing

Guaranty his lawyer had drafted to Essen in late February 2004.

92.     In a letter to Yary dated March 12, 2004 enclosing Garner's personal

financial statements, Essen also enclosed a version of Yary's "Continuing Guaranty" with

some minor edits.  Essen wrote "Stu has indicated his willingness to sign this Continuing

Guaranty and also to provide you with personal financial data as needed."

93.     In a letter to Yary dated April 2, 2004, Essen wrote: "Once we receive your

Subscription Agreement and investment check … interest will begin to accrue.  We will

then issue the Debenture security to you along with Personal Guaranties of Jeffrey A.

Gardner and Stu Voigt (based on the version drafted by your attorney)."  That same day,

April 2, 2004, Defendant faxed to Yary his Personal Financial Statement.  The date of

valuation is April 2, 2004 and listed Defendant's net worth as $10,258,000.  Defendant in

the same fax also included a copy of his 2002 income tax return and a handwritten

document entitled "Partnerships / LLC," listing a number of entities and the monthly

income, cost and year acquired and market value for each.  Defendant listed the market

value of his interests in partnerships and limited liability companies as $10,425,000.

94.     Defendant and Yary talked by telephone after Yary received Defendant's

personal financial statement.  Yary concluded after reviewing Defendant's personal

financial statement that Defendant had the means to honor his personal guaranty of

Yary's $100,000 investment in Hennessey.

95.     Defendant received a commission or "finder's fee" of at least 2% of Yary's $100,000 investment in Hennessey, which was contrary to his representation to Yary and which he did not disclose.

96.     Yary never received the final executed written personal guaranties from Defendant and Gardner.  However, Yary believed that Defendant, as a long-time friend and former teammate, would honor his agreement to personally guarantee his investment and did not actively pursue obtaining a signed document that memorialized that agreement.

97.     In 2006, Defendant solicited Yary to invest another $100,000 in Hennessey. Yary told him that if he were to increase his investment with Defendant, he would need to have the personal guaranty for the total amount in writing.  Defendant acknowledged his guaranty of the initial $100,000 investment and agreed to provide a written guaranty for the $200,000 investment.  However, Yary pursued another investment with a family member and did not increase his investment with Hennessey.

**Defendant's Solicitation of Plaintiff Irving Braverman to Invest in Hennessey**

98.     Plaintiff Irving Braverman has been a close friend of Plaintiff Marion Resnick for over 50 years.  Braverman had leased and operated drive-in movie theaters before retiring.  At all times relevant herein and currently, he works as a ticket-taker at a Twin Cities movie theater.

99.     In the fall of 2006, Braverman, then 81 years old, learned from Marion

34

Resnick about her and her son's investments.  She said that Defendant would know if Hennessey was taking new investors and that he probably would be able to "get you in" if Braverman wanted to invest.

100.    Braverman called Ken Resnick and asked him to speak to Defendant about the possibility of investing in Hennessey.  Ken Resnick called Defendant and told him that Braverman, an 82 year old man without significant assets, had expressed interest in investing in Hennessey.  Defendant said that Hennessey would be a great investment for Braverman and that he could "get him in."  He asked Ken Resnick to set up a meeting with Braverman.

101.    In early September 2006, Braverman met Defendant, Gardner, Larry Neumann (a Hennessey employee) and Resnick at the movie theater where Braverman worked as a part-time ticket taker.  Defendant gave Braverman his First Commercial Bank business card bearing the title "Chairman of the Board" and his home phone number written by hand.  Braverman thought that it was odd that three representatives of Hennessey came to the meeting and was immediately uncomfortable.  Gardner and Neumann gave the sales pitch for Hennessey and gave Braverman a copy of the Hennessy's Private Placement Memorandum dated October 7, 2005.

102.    During this meeting, Defendant told Braverman that he would "back up" the investment.  Braverman knew that Defendant "had banks" and considerable wealth. Braverman understood that Defendant would personally guarantee his investment as he had with Marion and Ken Resnick's investments.  Braverman asked about warning

language in the document and Defendant said, "Don't worry about it. Legally, we have to put it in there." Defendant also told Braverman that the investment would be safe, secure and that "you can sleep like a baby because you will never have to worry about your principle."

103.    Relying on Defendant's representations regarding the safety of the investment and his promise to personally guarantee the investment, he committed to investing $135,000. Braverman was not wealthy but had a total of $139,747.73 invested in an investment fund managed by a financial advisor. He had little investment knowledge or experience and did not participate in the investment decisions. He would soon receive additional funds from the sale of a condominium. Rather, he relied on Defendant's representations, advice and encouragement in deciding to move his investment from a managed investment fund to invest with Hennessey.

104.    Shortly thereafter, Braverman liquidated his entire stock portfolio. He received two checks from at UBS Financial Services Inc ("UBS") dated September 12, 2006: one for $63,057.30 and a second for $76,698.43. Neumann met Braverman at the movie theater and Braverman endorsed both checks over to Hennessey. Braverman received a subordinated debenture (D-20060912) dated September 12, 2006 for $135,000 at 12% for two years. A month later, Braverman contributed additional principle (from the sale of the condominium) that brought his total investment with Hennessey to $200,000. He received a superseding subordinated debenture (D-20061013) dated October 13, 2006 for the principle sum of $200,000 at 12% for two years. The debenture

states that this sum was comprised of the contribution on September 12, 2006 of $135,000 and additional contribution of $65,000 on October 13, 2006.

105.    Defendant received a commission of at least 2% of Braverman's investments with Hennessey.  Defendant did not reveal to Braverman or to Ken Resnick that he had received the commission(s).

### Defendant's Misrepresentations to Plaintiffs Regarding the Failure of Hennessey and the Jaguar "Solution"

106.    Defendant possessed detailed confidential information unavailable to Plaintiffs and other investors that clearly indicated that Hennessey was in serious financial trouble but did not inform any of the Plaintiffs of the heightened risk to their already risky investments.  At no time did Defendant inform any of the Plaintiffs that their principle investments with Hennessey were in jeopardy due to the real estate market crises and Hennessey's increasingly desperate situation.

107.    Not only did Defendant repeatedly represent Plaintiffs that their investments in Assured and Hennessey carried very little risk and repeatedly spurred them on to greater levels of investment, he made representations to them regarding Hennessey's financial condition and security of their investments that he knew or should have known were false.

108.    Worse, Defendant encouraged Ken and Marion Resnick to hold promissory notes beyond their maturity date when he knew or should have known that Hennessy's financial condition was rapidly deteriorating and there was a significantly heightened possibility that both could lose his investment.

109.    Defendant, by April 2007 if not earlier, had seen charts and other documents showing that Hennessey was experiencing significant losses and could fail. Approximately eight months later, in November, 2007 when Ken and Marion Resnick's smaller promissory notes (Investments 051002 and 051202 respectively) were about to mature, Defendant advised Ken Resnick not to redeem them but to leave them invested with Hennessey despite knowing that Hennessey was insolvent or near insolvency and that they were at an even greater risk of losing their investments (*see* ¶ 75).

110.    By at least late 2007, Hennessey in fact was experiencing severe financial difficulties and by January 2008 Assured, which was still closely affiliated with Hennessey, had cash flow difficulties so serious that it could not stay current on its interest obligations.  Defendant, as Chairman of the Board of Assured and a major investor, knew or should have known of Assured's severe financial problems, which put him on notice that Hennessey faced similar concerns.

111.    Furthermore, by 2008 if not earlier, due to Hennessey's increasing inability to satisfy its debt obligations, the company was making interest payments to investors not with profits from mezzanine lending but with new principle investments.  Hennessey had become a Ponzi scheme.  Upon information and belief, Gardner and others also diverted investors' funds to finance their lavish lifestyles.  Defendant knew or should have known that Hennessey was on the verge of being insolvent if not already insolvent and engaged in fraud at the same time he was representing to Ken and Marion Resnick that their investments were safe and secure and advising them to continue investing with the

company.

112.   In the early spring of 2008, prior to receiving any information from Hennessey that indicated that Hennessey was experiencing financial problems, Ken Resnick asked Defendant if the rapid decline of real estate values reported extensively in the media would force Hennessey to lower its interest rates.  Defendant responded that everything was fine with Hennessey's business and not to worry.

113.   Each of the Plaintiffs received a letter from Hennessey dated May 1, 2008 stating that Hennessey faced "challenges" resulting from the decline of the real estate market and near collapse of the credit markets.  However, the letter states that Hennessey has "made solid progress" in pursuing "workable solutions" to these challenges.  It further states that the mission and goal of Hennessey remains to provide "above market returns to its investors" and that the "primary goal given the current market conditions is to protect the future of Hennessey Financial and its current Investors."  Because of the failing real estate market, Plaintiffs were not surprised by the news that Hennessey was experiencing "challenges" – they all had expected some notice to that effect.  Yet, each was encouraged by Hennessey's representations that there were workable solutions to these challenges, that those solutions were coming along well and that the company was still committed to paying the interest rates they were receiving.

114.   However, at the very latest, Defendant, who was an experienced investor and member of Hennessey's Financial Advisory Board as well, Chairman of the Board of Assured and of two banks, at this point knew or should have known that Hennessey was

melting down and that Plaintiffs were going to lose their investments.  Defendant was

knowledgeable about the real estate and financial markets.  He knew or should have

known that the real estate bubble was bursting and that Hennessey, whose business was

high-risk mezzanine real estate financing, was about to collapse.  His financial and

leadership positions in Assured and Hennessey afforded him access to information

regarding Hennessey's financial "challenges" (as well as the condition of Gardner's other

businesses) and what "solutions" were being planned.  However, Defendant chose not to

warn Plaintiffs about the looming crises.

115.    Plaintiffs received a second letter from Hennessey dated May 14, 2008,

which stated for the first time that Hennessey's senior lender had stopped all investor

payments and accruals as of May 1, 2008, was discontinuing financing and seizing

Hennessey's assets.  The letter referred to the past 18 months of frustration and troubles.

However, the letter states that Gardner continued to look for re-financing solutions.  It

states that if he is unsuccessful in obtaining additional financing, Hennessey will be

forced to discontinue operations and "all investments will be lost."  Defendant knew or

should have known for the 18 months prior to this letter that Hennessey was in

experiencing significant problems to the point that it may fail and all investments would

be lost.  Defendant knew or should have known that efforts to find a "solution" to

Hennessey's problems were unrealistic and statements holding out that hope to investors

were disingenuous and purposefully misleading.

116.    Immediately upon receiving the May 14 letter, Ken Resnick called

Defendant to discuss his and his mother's investments.  He said that had he or his mother

known that even moderate risk was involved, they would not have made the investments

referred to herein and never would have put their entire life savings into one investment.

Defendant stated that if Hennessey failed, all of their investments could be lost.  When

Ken Resnick asked pressed Defendant further about what was going to happen to his and

his mother's investments, he became angry and said that he stood to lose much more – $3

million – and that his brother would lose about $500,000 and his wife about $300,000.

He stated that he, more than anyone, wanted a solution to Hennessey's problems.  Ken

Resnick believed that his friend was also victim like he and that their interests were

aligned.  Because Defendant represented himself as a victim, he still trusted Defendant

and believed that he would work to protect his and the other Plaintiffs' investments with

the same care and energy Defendant devoted to salvaging his own investments.  Over the

next few weeks, Defendant and Ken Resnick talked on a daily basis about the crises and

Defendant continually reassured him that there was a plan in the works that would

prevent them from losing their investments.

117.    Immediately after Braverman received the May 14, 2008 letter, his son,

Jeffrey Braverman, called Defendant and demanded that he honor his personal guaranty

of Braverman's $200,000 investment.  Defendant denied personally guaranteeing the

investment.

118.    Marion Resnick called Defendant herself after receiving the May 14 letter

and asked Defendant what would become of her investments.  Defendant told her not to

41

worry, that they were working on a plan that would keep her investment safe.

119.   A day or two after receiving the May 14 letter, Yary also called Defendant and asked him about the letter and his investment in Hennessey.  Defendant said that he stood to lose his entire $2.2 million investment in Hennessey and that his wife would lose her investment if Hennessey failed.  Defendant said that he, Yary and the other Plaintiffs were all in the same position.  Defendant reassured him that a plan was in the works that would prevent them from losing their investments.  Yary, believing that Defendant risked suffering a much larger loss than he, did not demand that Defendant honor his personal guaranty but hoped that Defendant and Hennessey would find a way to salvage their investments.

120.   Plaintiffs received another letter dated June 6, 2008 stating that Hennessey would be dissolved and no payments to unsecured creditors would be made.  However, the letter went on to state that there is a "re-organization plan whereby our unsecured creditors will receive preferred shares in a publically traded entity" and that the preferred shares will pay dividends.

121.   After receiving the June 6, 2008 letter, Ken Resnick told Defendant that they needed to get an attorney to ensure that someone was looking out for their life savings.  Defendant told him that Todd Duckson, a lawyer, was negotiating with Capital Solutions, Hennessey's senior lender, and that Duckson was as good of a lawyer as you can get.  Defendant assured him that Duckson was looking out for the interests of investors like them.  Defendant told Ken Resnick that he recently had spent three hours

42

with Duckson talking about the solution.

122.   In fact, Capital Solutions Monthly Income Fund, L.P. was formerly known as Hennessey Financial Monthly Income Fund, L.P. ("the Fund").  Its sole business was to make mezzanine real estate loans to Hennessey, the sole borrower.  Hennessey's borrowers (which were real estate developers affiliated with Hennessey) Gardner and others associated with Hennessey, defaulted in March 2008 and Hennessey foreclosed on them.  Furthermore, Duckson served as outside counsel to both the Fund and Hennessey and advised Hennessey to foreclose on the real estate.  This made the Fund's foreclosure on Hennessey in May inevitable.  The Fund used most of the money it raised from the foreclosure to pay senior lenders on the properties the Fund had acquired and to make interest payments to existing investors of the Fund.  After the foreclosure in early summer 2008, Duckson as outside counsel ran the real estate projects that Hennessey had previously ran and in November 2008 through his firm Transactional Finance became the investment advisor to the Fund.  All of this was or should have been known to Defendant.  Also, Defendant did not disclose to Plaintiffs that he had numerous investments and financial ties with Duckson.[7]

123.   Ken Resnick relayed Defendant's reassurances to Marion Resnick and Braverman.  They relied on Defendant's representation that an attorney had been retained on behalf of the unsecured creditors and that Defendant and Hennessey were doing

---

[7] Duckson is a defendant in *S.E.C. v. True North Finance Corporation et. al*, 10-cv-03995 (D. Minn.) for fraud, including fraud related to some of the entities and events described in this Complaint.

everything possible to protect their investments.

124.   Defendant, in a conversation a day or two later, told Ken Resnick that he had talked with Duckson.  He told Ken Resnick about a planned investor meeting at which Gardner would present to investors a "solution" to Hennessey's financial problem. Defendant told him that the plan involved putting $10 million into a public company and investors would receive shares of stock probably valued at $4 or $4.50 a share.  Ken Resnick asked Defendant how a company could be formed so quickly.  Defendant responded that the plan was to buy a shell company that was already publicly traded. Defendant told him that it was possible that if things went really well, the stock could be worth more than everyone's current investment in Hennessey.  He told him that with the collapse of the real estate market, they would be able to pick up valuable real estate cheaply and resell it for a profit.  Ken Resnick relayed what Defendant had told him to his mother and went to the theater to convey it to Braverman, who was greatly relieved to hear the news.  All three relied on Defendant's representation that Hennessey had a "solution" to Hennessey's financial problem that likely would protect their investments.

125.   Plaintiffs received a June 12, 2008 letter enclosing copies of the senior lender's notice of foreclosure on all of Hennessey's assets.  The sale of those assets was scheduled for June 27, 2008.  The letter announced a meeting for June 25, 2008 to outline "a re-organization plan whereby our unsecured creditors will receive preferred shares in a publicly traded entity" with initial capital of $10,000,000 and will pay a dividend of 2.5%.  This new company would utilize its financing to purchase distressed real estate.

The unsecured creditors who converted their Hennessey notes to shares in the new company would be able to convert their preferred shares to publically traded shares and sell them in the open market.  The plan first announced to investors in the letter was identical to the plan Defendant previous described, demonstrating that Defendant had sources of information regarding Hennessey and Plaintiffs' investments that were not otherwise available to Plaintiffs.

126.    A June 19, 2008 letter from Hennessey informed Plaintiffs of a meeting for all Hennessey note holders at the Millennium Hotel Minneapolis on June 25, 2008.  The letter stated that the agenda for the meeting included a review of the pending Hennessey foreclosure and outline of the reorganization plan for unsecured creditors.  The letter provided information to listen to the meeting by phone or to listen and view a PowerPoint presentation via an internet "Webinar."

127.    Defendant picked up Ken Resnick and they drove to the June 25 meeting together.  Braverman also attended the meeting in person.  Marion Resnick listened to it on the phone.  Yary listened to the meeting and viewed the presentation via the Webinar.

128.    At the meeting, Gardner presented the reorganization plan and informed the investors that upon execution of a subscription agreement they would receive shares in a publicly traded company with $10 million in financing.  The shares would be valued $4.00 per share and the number each investor received would correspond to the amount Hennessey owed them.  Gardner stated that the new company would pay a dividend of approximately 2.5% of their investment in the new company.  Gardner said that this plan

was their only opportunity to recover any assets.  The other alternative was an unsatisfied judgment.  Gardner stated that they would have two weeks to decide whether or not to sign the subscription agreement.

129.    Defendant left the room as soon as the meeting was over.  Braverman confronted him outside the hotel and asked him about the guaranty Defendant gave him. He said to Defendant, "You said you'd back it up!"  Defendant again denied guaranteeing Braverman's investment.

130.    Ken Resnick discovered at the June 25, 2008 meeting that the Hennessey investors were not a small, select group as Defendant had led him and the other Plaintiffs to believe, but consisted of over 100 investors in at least five states.

131.    Immediately after the June 25, 2008 meeting, Yary called Defendant and asked him if he should sign the Jaguar subscription agreement.  He asked Defendant what Defendant was going to do.  Defendant told Yary that the plan was the only opportunity they had to recover any of their losses and that he was going to sign the subscription agreement.

132.    The Plaintiffs each received a letter from Hennessey signed by Gardner dated July 2, 2008 following up on the June 25, 2008 meeting.  The letter states that Gardner had heard from "numerous investors who have expressed their desire to convert their Hennessey … note into preferred shares of a to be formed corporation tentatively named Jaguar Financial Corporation."  Investors had until July 15, 2008 to make the conversion.

133.    Attached to the letter was a subscription agreement for Jaguar.  The agreement provided almost no information about Jaguar.  By signing the agreement, the Hennessey investor received Series A Exchangeable Redeemable Preferred Stock in Jaguar in exchange for releasing Hennessey from its obligations to the investor.  However, it contained numerous representations and warranties of the subscriber.  Section 2.3 is a broad waiver and release of claims:  "Hennessey and its respective affiliates and their shareholders, guarantors, consultants, employees, attorneys, accountants, officers, directors, creditors, lenders, and all other parties of and from and against any claims related to such parties prior business relationship with Subscriber."

134.    Based on Defendant's prominent involvement with Hennessey, and his knowledge of and access to confidential information regarding the Jaguar plan, as well as his representation that the plan was the only way to recover some of Hennessey's losses and that Defendant himself was singing the subscription agreement, Yary signed the subscription agreement dated July 12, 2008.

135.    In conversations after the June 25, 2008 meeting and after receiving the subscription agreement, Ken Resnick asked Defendant if he and his mother should sign the subscription agreement.  Defendant told him that "this is your only chance of getting some money back, so why wouldn't you?"  Based on Defendant's advice and encouragement, Ken and Marion Resnick signed the Jaguar subscription agreement, dated July 15, 2008.  Each indicated that they were not an accredited investor or a "qualified client" with a net worth of at least $1,500,000.

47

136.    Defendant did not sign the Jaguar subscription agreement.  He did not sign the agreement, upon information and belief, because he did not believe the Jaguar "re-organization plan" would provide more than token repayment and because he wanted to preserve the possibility to recover his losses through litigation or other adverse action arguably waived by signing the subscription agreement.

137.    Yary subsequently called Defendant and asked him how he was going to account for the portion of Hennessey investment that he transferred to Jaguar.  Defendant told Yary that he was not going to account for the investment in Jaguar but was going to report the total loss associated with the Hennessey investment, which he put at $2,200,000, all in one year.  Defendant failed to tell Yary that the reason he was not subtracting from his reported losses some estimate of what the Jaguar investment was worth was that he had not invested in Jaguar as Defendant represented to Yary.

138.    Upon information and belief, Defendant did not lose his entire investment with Assured and Hennessey.  His wife, upon information and belief, lost $117,000.

139.    Each of the Plaintiffs received a letter dated October 8, 2009 signed by Gardner enclosing the stock certificate in Jaguar and an executed copy of their subscription agreements.

140.    Jaguar had little to no assets and, upon information, and belief had only a small amount of financing from the Fund.  It never had close to the $10 million in financing represented at the June 25, 2008 meeting and in the July 2, 2008 letter enclosing the Jaguar subscription agreements.  Jaguar also was never a publicly traded

48

company and its shares have no value.  Although it made some payments over periods of time that varied by investor, Jaguar was never a legitimate "solution" to the total loss of Plaintiffs' investments.  Rather, Jaguar was a fraudulent vehicle designed to release Hennessey from its obligations to its investors, pacify them as long as possible and shield Hennessey's officers, directors, guarantors, consultants, agents and others from liability.

141.   Upon information and belief, Defendant intentionally promoted to Plaintiffs the fiction that Jaguar was the "solution" that would enable them to recover their losses. He knew or should have known that Jaguar had no assets and that given Gardner's track record no one would provide $10 million in capital.  He knew or should have known that it would not be a publically traded company and that its shares would not be exchangeable or redeemable.  He knew or should have known that Jaguar would never become successful to the point that the shares investors had received in exchange for their Hennessey investments would even come close to equaling or exceeding their previous investments.  Defendant's representations regarding Jaguar and his advice and encouragement to Plaintiffs to sign the subscription agreement were not in their best interests but instead furthered Defendant's interests, including potentially immunizing him from litigation related to his involvement with Hennessey and providing hope to Plaintiffs that their investments would ultimately recover, thereby deflecting anger, criticism, inquiry and demands for payment away from him.

142.   Ken and Marion Resnick and Braverman, relying on Defendant's representations and advice, believed that exchanging their Hennessey investments for

49

shares in Jaguar would preserve and ultimately restore their principle investments. Yary, relying on Defendant's representations and advice, also believed that exchanging his Hennessey investment for shares in Jaguar would result in an at least partial but significant restoration of its former value. As a result, each of the Plaintiffs fell victim to yet another fraud. They transferred their investments to Jaguar and signed away their rights to recover money owed to them by Hennessey.

143.   Plaintiffs trusted Defendant because of their personal relationships with him and believed that he would always look out for their best interests. They also believed that he was a victim like they were. At this point, they did not believe that Defendant had been fraudulent or negligent in his conduct with respect to them.

144.   Ken Resnick consulted a friend who was a retired FBI agent about whether there was anything else he, his mother and Braverman should be doing to try to save their investments. They set up a meeting for Thursday, July 10, 2008 at the Olive Garden in Bloomington and another retired FBI agent, who had specialized in white collar crime, would join them. Ken Resnick told Defendant about it and Defendant wanted to join them. They discussed the Hennessey's collapse and the creation of Jaguar as a way of salvaging Plaintiffs' investments. The retired agents had significant doubts about Gardner, Hennessey and Jaguar. At the lunch, Defendant was evasive in response to a number of questions about Hennessey and Jaguar. When Ken Resnick and the retired agents discussed possible options including legal action against Gardner and others involved in Assured, Hennessey and Jaguar, Defendant responded several times that "the

50

money's gone – why worry about it?"  A short time after the lunch, Ken Resnick asked one of the retired agents if it was possible that Defendant was not being truthful about his victim-like-them status and his level of knowledge leading up to the collapse of Hennessey.  The retired agent stated that he had serious concerns about Defendant's role in both Hennessey and Jaguar.  The other retired agent subsequently also reinforced Ken Resnick's suspicions about Defendant.

145.   It was not until after speaking with the retired agents and after extensively reflecting on Defendant's conduct and position within Assured and Hennessey did Ken Resnick reluctantly began doubting the conduct and truthfulness of Defendant, his good friend at the time.

## COUNT I
## Material Misrepresentations and Omissions under the Exchange Act and Rule 10b-5

146.   Plaintiffs restate and reallege the allegations in paragraphs 1 – 145 hereinabove as if fully stated herein.

147.   Defendant's material misrepresentations and omissions to Plaintiffs violate § 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

148.   Defendant made material statements and representations to Plaintiffs, and omitted material facts necessary to make the statements and representations he made, in light of the circumstances under which they were made, not misleading, including the statements and representations set forth in hereinabove.  Defendant had actual knowledge

that the aforesaid statements and representations were untrue or misleading and that the aforesaid representations, statements and material omissions constituted fraud, and were intended by Defendant to induce Plaintiffs into relying on the truth thereof and invest monies with Defendant, Assured and Hennessey.

149.   From early 2003, Defendant had both direct and indirect financial interests in the issuance of promissory notes and the sale of subordinated debentures of Assured and Hennessey because he received commissions from Plaintiffs' initial investments and renewed investments, received interest payments and repayments of loans, profit distributions and other pecuniary benefits.  Prompted by these financial incentives, Defendant made various oral and written statements and representations set forth hereinabove, and failed to inform Plaintiffs of the material omissions set forth hereinabove.

150.   Defendant was, or certainly should have been, aware of the high risk associated with the Assured and Hennessey investments, particularly the warnings printed in Assured's and Hennessey's Private Placement Memorandums: "**HIGHLY SPECULATIVE, INVOLVE A HIGH DEGREE OF RISK AND IMMEDIATE SUBSTANTIAL DILUTION, AND SHOULD BE PURCHASED ONLY BY PERSONS WHO CAN AFFORD TO LOOSE THEIR ENTIRE INVESTMENT**; that concentrating all investment resources in one type of investment involved a high degree of risk; that Marion Resnick and Braverman were of an advanced age and should not move all of their investment resources out of diversified managed investment

52

portfolios and concentrate them in one high risk investment; that his representations about the nature of the investments and promises to guarantee the investments would induce Plaintiffs to make the investments; that the collapse of the real estate market was causing and would cause serious financial problems for Hennessey that very likely could wipe out Plaintiffs' investments; that his aforesaid statements, representations and material omissions were and are highly unreasonable and involve extreme departures from any acceptable standard of ordinary care, constituting a willful effort to mislead Plaintiffs into believing the statements and representations, and in reliance thereon make their respective investments.

151.    During the period from May 1, 2008 to present, Defendant had direct and indirect financial interests and other material interests associated with Jaguar and Plaintiffs' receipt of Jaguar stock in exchange for releasing Hennessey from its obligations to investors.  Defendant was, or certainly should have been aware, that Jaguar would not be a "solution" for Hennessey's unsecured investors to regain or even exceed their investments in Hennessey; that he would not, and did not, sign the Jaguar subscription agreement contrary to his representations to Plaintiffs referenced hereinabove; that he did not lose money in the amount he represented to Plaintiffs; that telling Plaintiffs that he, like they, had lost a substantial sum of money would make it less likely that Plaintiffs would demand that he honor his personal guaranties; that by telling Plaintiffs that he was going to sign, and in fact had signed, the subscription agreement, making the aforesaid representations about Jaguar and encouraging them to sign the

53

subscription agreement would induce them to sign the agreement in order to try to insulate himself and others associated with Hennessey from lawsuits and other adverse actions.

    152.    The aforesaid material statements and representations Defendant made to Plaintiffs were, when made and presently are, false and untrue statements of material fact and the aforesaid omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading include, but are not limited to, the following:

    a.  Defendant's representations that he would guarantee or had personally guaranteed Plaintiffs' investments;

    b.  Defendant's omissions of material fact that he would not, or did not intend to, honor his personally guarantees of Plaintiffs' investments;

    c.  Defendant's representation to Yary in response to a direct question that he would not receive a commission or finder's fee for Yary's investment;

    d.  Defendant's omission of material fact that he received as a commission or finder's fee a percentage of Plaintiffs' investments and renewals;

    e.  Defendant's representations that the investments in Assured and Hennessey were safe and secure, that they carried no risk, that Plaintiffs could "sleep like a baby and never have to worry about it", and "short of a nuclear war, [they] have nothing to worry about;"

    f.  Defendants' representations, and/or omissions of material fact that led Plaintiffs to believe, that Assured and Hennessey were comprised of a small group of investors;

    g.  Defendants' representation, and/or omissions of material fact that led Plaintiffs to believe, that access to Assured and Hennessey investment opportunities could be had only through him;

    h.  Defendants' representations, and/or omissions of material fact that led Ken and Marion Resnick and Braverman to believe, that they were secured

lenders to Assured and Hennessy;

i.   Defendant's omission of material fact that Hennessey's senior lender was , Capital Solutions Monthly Income Fund, L.P. was formerly known as Hennessey Financial Monthly Income Fund, L.P., and that the senior lender foreclosing on Hennessey was a related company;

j.   Defendant's representation to Ken and Marion Resnick and Braverman, who were vulnerable, unsophisticated investors without significant wealth, that it was wise to transfer their investments from safer, managed investment accounts to the high-risk investments in Assured and Hennessey, respectively, and to concentrate all their investments in one investment structure;

k.   Defendant's representations and/or omissions of material fact that led Plaintiffs to believe that he arranged their investments solely out of friendship and thus was put their interests ahead of his own;

l.   Defendant's representations that he would "watch [Plaintiff's] investments like a hawk;"

m.  Defendant's representation that Plaintiffs could take their money out of their investments at any time;

n.   Defendant's representation that it was "crazy for someone [Marion Resnick's] age to have [her] money in the stock market" and that Assured and Hennessey were wiser alternatives, and his omission of material fact that Marion Resnick and Braverman should not invest in Hennessey at their age;

o.   Defendant's representations to Ken and Marion Resnick that Assured was being "shut down" and that Hennessey was almost identical with the same approach of raising capital from a small group of select investors;

p.   Defendant's representation to Ken and Marion Resnick a longer loan commitment carried no additional risk associated;

q.   Defendant's representations to the contrary or omissions of material fact that the collapse of the real estate market was seriously affecting Hennessey and Plaintiffs' investments could be lost;

r.   Defendant's representation that Braverman should disregard the language in Hennessey's Private Placement Memorandum warning about the risk

associated with the investment;

s.  Defendant's representation to Ken Resnick that Todd Duckson had been retained to represent investors like Plaintiffs to develop a plan to rescue their investments;

t.  Defendant's representation that signing the Jaguar subscription agreement was in their best interests;

u.  Defendant's representation that the Jaguar "reorganization" and "solution" could allow Hennessey's unsecured investors to recover or even exceed their losses;

v.  Defendant's representation that Plaintiffs would receive shares in Jaguar, a publically traded entity with an initial capitalization of $10 million;

w.  Defendant's representation that he would, and had, signed the Jaguar subscription agreement;

x.  Defendant's omission of material fact that encouraging Plaintiffs to sign the Jaguar subscription agreement was an attempt to insulate himself from lawsuits and other adverse actions;

y.  Defendant's representation to Yary that on his tax returns he had not factored his receipt of Jaguar stock into his Hennessey losses and was going to report 100% of his losses, and his omission of the material fact that he had not signed the Jaguar subscription agreement;

z.  Defendant's representation that he lost $3 million, his wife had lost $300,00 and his brother lost $500,000 when Hennessey failed;

153.  Plaintiffs did not know that the aforesaid material statements and representations were untrue or omitted material facts.  They reasonably relied upon the truthfulness of the aforesaid material statements, representations and omissions Defendant made to Plaintiffs in connection with, and as inducements to, Plaintiffs' investing in Assured and Hennessey respectively, and signing the Jaguar subscription agreement.

154.    Defendant's misrepresentations or omissions in context, taken separately or together, misled Plaintiffs and induced them to make the aforesaid investments.  Those misrepresentations and omissions led Plaintiffs to the mistaken conclusions enumerated hereinabove, including but not limited to representations that the investments referenced hereinabove had no or almost no risk and that Defendant's personal guaranty further obviated any potential risk; that he would receive a commission or finder's fee for Plaintiffs' investment; that investments were secured; that investments were limited to a small group of select investors; that Plaintiffs could get there principle investment back whenever they wanted; and that he was monitoring each of Plaintiffs' investments. Defendant's representations or omissions misled and induced Plaintiffs into making investments they would not otherwise have made.

155.    Defendant's misrepresentations and omissions related to the advisability of signing the Jaguar subscription agreement and his decision not to sign the agreement, led Plaintiffs to conclude that the Jaguar "solution" provided the only hope of recovering any of their loses.

156.    Defendants are liable to Plaintiffs for each of the respective Plaintiff's damages, as a "person" who violated the aforesaid provisions of the Exchange Act and sells, solicits or induces the purchase or issuance of a security by means of an untrue statement of a material fact or an omission of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, or as an individual who is an officer, director, employee or agent of, or

57

associated with, such a "person" and material aids the illegal sale, inducement or issuance of the securities to Plaintiffs.

157.    Defendant utilized means or instrumentality of interstate commerce, or the United States Mail, to communicate the aforesaid materially false misrepresentations and omissions.

158.    As a direct and proximate result of Defendant's aforesaid material misrepresentations and omissions, each of the Plaintiffs were damaged in the respective amounts of their entire principle investments, and accrued interest, as set forth hereinabove and at Paragraphs 6 through 8, and suffered other associated monetary damages.

## COUNT II
## Material Misrepresentations and Omissions under the Minnesota Securities Act

159.    Plaintiffs restate and reallege paragraphs 1 through 158 hereinabove, as if fully stated herein.

160.    Defendant's aforesaid material misrepresentations and omissions to Plaintiffs violate the applicable provisions of the Minnesota Securities Act, specifically Minn. Stat § 80A.01 and 80A.68.

161.    Defendant made material statements, representations and omissions to Plaintiffs, including the statements and representations set forth in Paragraphs 149 through 155 hereinabove, knowing and intending that Plaintiffs would rely on those statements and representations in determining whether they should invest in Assured and

Hennessey, and sign the Jaguar subscription agreement.  Defendant made material

statements and representations to Plaintiffs, and omitted material facts necessary to make

the statements and representations that were made, in light of the circumstances under

which they were made, not misleading referenced hereinabove.  Defendant had actual

knowledge that the aforesaid statements and representations were untrue or misleading,

and that aforesaid representations, statements and material omissions constituted fraud,

and were intended by Defendant to induce Plaintiffs into relying on the truth thereof and

invest monies with Defendant, Assured and Hennessey.

162.    During the period from early 2003 to July 12, 2008, Defendant had both

direct and indirect financial interests in the issuance of promissory notes and the sale of

subordinated debentures of Assured and Hennessey because he received commissions

from Plaintiffs' initial investments and renewed investments, interest payments and

repayments of loans, profit distributions and other pecuniary benefits.  Prompted by these

financial incentives, Defendant made various oral and written statements and

representations set forth hereinabove, and failed to inform Plaintiffs of the material

omissions set forth hereinabove.

163.    Defendant was, or certainly should have been, aware of the high risk

associated with the Assured and Hennessey investments, particularly the warning in

printed in Assured's and Hennessey's Private Placement Memorandums: "**HIGHLY
SPECULATIVE, INVOLVE A HIGH DEGREE OF RISK AND IMMEDIATE
SUBSTANTIAL DILUTION, AND SHOULD BE PURCHASED ONLY BY**

**PERSONS WHO CAN AFFORD TO LOOSE THEIR ENTIRE INVESTMENT**;

that concentrating all investment resources in one type of investment involved a high

degree of risk; that Marion Resnick and Braverman were of an advanced age and should

not move all of their investment resources out of diversified managed investment

portfolios and concentrate them in one type of high risk investment; that his

representations about the nature of the investments and promises to guarantee the

investments would induce Plaintiffs to make the investments; that the collapse of the real

estate market was causing and would cause serious financial problems for Hennessey that

very likely could wipe out Plaintiffs' investments; his aforesaid statements,

representations and material omissions were and are highly unreasonable and involve

extreme departures from any acceptable standard of ordinary care, constituting a willful

effort to mislead Plaintiffs into believing the statements and representations, and in

reliance thereon make their respective investments.

    164.   During the period from May 1, 2008 to present, Defendant had direct and

indirect financial interests and other material interests associated with Jaguar and

Plaintiffs' receipt of Jaguar stock in exchange for releasing Hennessey from its

obligations to investors.  Defendant was, or certainly should have been aware, that Jaguar

would not be a "solution" for Hennessey's unsecured investors to regain or even exceed

their investments in Hennessey; that he would not, and did not, sign the Jaguar

subscription agreement contrary to the representations to Plaintiffs referenced herein

above; that he did not lose money in the amount he represented to Plaintiffs; that telling

Plaintiffs that he, like they, had lost a substantial sum of money would make it less likely that Plaintiffs would demand that he honor his personal guaranties; that by telling Plaintiffs that he was going to sign, and in fact had signed, the subscription agreement, making the aforesaid representations about Jaguar and encouraging them to sign the subscription agreement would induce them to sign the agreement in order to try to insulate himself and others associated with Hennessey from lawsuits and other adverse actions.

165.   Plaintiffs did not know that the aforesaid material statements and representations were untrue or omitted material facts.  They reasonably relied upon the truthfulness of the aforesaid material statements, representations and omissions Defendant made to Plaintiffs in connection with, and as inducements to, Plaintiffs' investing in Assured and Hennessey respectively, and signing the Jaguar subscription agreement.

166.   Defendant's misrepresentations or omissions in context, taken separately or together, misled Plaintiffs and induced them to make the aforesaid investments.  Those misrepresentations and omissions led Plaintiffs to the mistaken conclusion that the investments referenced hereinabove had no or almost no risk and that Defendant's personal guaranty further obviated any potential risk.  Defendant repeatedly represented that the investments were safe and secure and that there was no risk to their principle. Defendant falsely represented on at least one occasion that he would not receive a commission or finder's fee for the investment he solicited from Yary and with each and

every one of Plaintiffs' investments he omitted the key fact that he received a
commission for that investment or renewal.  Defendant also misrepresented and omitted
material facts regarding how Assured and Hennessey, and the investments structures,
operated.  He omitted crucial facts such as the presence of senior lenders, that the
investments were unsecured, and that the investors were not a small group formed
through personal relationships but, in the case of Hennessey for example, the unsecured
investors numbered over 100.  He also misrepresented and omitted material facts
regarding his claim to pay close attention to each of Plaintiffs' investments.  Defendant's
representations or omissions misled and induced Plaintiffs into making investments they
would not otherwise have made.

167.    Defendant's misrepresentations and omissions related to the advisability of
signing the Jaguar subscription agreement and his decision not to sign the agreement, led
Plaintiffs to conclude that the Jaguar "solution" provided the only hope of recovering any
of their loses.

168.    Defendants are liable to Plaintiffs for each of the respective Plaintiff's
damages, pursuant to Minn. Stat. § 80A.76(b) as a "person" who sells, solicits or induces
the purchase or issuance of a security by means of an untrue statement of a material fact
or an omission of a material fact necessary to make the statements made, in light of the
circumstances under which they were made, not misleading, or as an individual who is an
officer, director, employee or agent of, or associated with, such a "person" and material
aids the illegal sale, inducement or issuance of the securities to Plaintiffs and pursuant to

Minn. Stat. § 80A.76(b) as an unregistered broker-dealer and agent.

169.    As a direct and proximate result of Defendant's aforesaid material

misrepresentations and omissions, each of the Plaintiffs were damaged in the respective

amounts of their entire principle investments, and accrued interest, as set forth

hereinabove, and suffered other associated monetary damages.

### COUNT III
### Fraud and Negligent Misrepresentation

170.    Plaintiffs restate and reallege paragraphs 1 through 169 hereinabove, as if

fully stated herein.

171.    Defendant made false material statements, representations to Plaintiffs,

including the statements and representations set forth in Paragraphs 149 through 155

hereinabove, knowing and intending that Plaintiffs would rely on those statements and

representations in determining whether they should invest in Assured and Hennessey, and

sign the Jaguar subscription agreement.  Defendant made material statements and

representations to Plaintiffs, and omitted material facts necessary to make the statements

and representations that were made, in light of the circumstances under which they were

made, not misleading, including the statements and representations referenced

hereinabove.  Defendant had actual knowledge that the aforesaid statements and

representations were untrue or misleading, or made without knowing whether the facts

therein were true, and that aforesaid representations, statements and material omissions

were intended by Defendant to induce Plaintiffs into relying on the truth thereof and

invest monies with Defendant, Assured and Hennessey, and sign the subscription agreement with Jaguar.

172.   Plaintiffs lacked the means, ability, experience or access to information to know the truth or falsity of Defendant's aforesaid statements, representations and omissions.  Defendant on the other hand was a sophisticated investor, educated and experienced in finance, real estate and business – facts which were known to and relied upon by Plaintiffs.  Defendant was also an officer and director of Assured and Hennessey, as well a significant owner and investor in both companies.  He possessed knowledge and information as a result of his intimate relationship with and control of Assured and Hennessey and individuals associated with those companies.  Plaintiffs relied on that knowledge and access to information when deciding to invest with Defendant, Assured and Hennessey, and when they decided to sign the Jaguar subscription agreement.  Defendant did not deal with Plaintiffs at an arm's length basis but was a close personal friend to Ken and Marion Resnick and to Yary, and the friend of some of Braverman's closest friends.  All four Plaintiffs relied on the truthfulness of Defendant's statements and representations because of those friendships.  Ken and Marion Resnick and Braverman relied on the aforesaid misrepresentations and false statements because of Defendant's significantly superior knowledge and experience.  All Plaintiffs believed and relied on Defendant's aforesaid representations, particularly his promise to personally guarantee their investments, because of his close friendship with Plaintiffs.

173.   As a direct and proximate result of Defendant's aforesaid material misrepresentations and omissions, each of the Plaintiffs were damaged in the respective amounts of their entire principle investments, and accrued interest, as set forth hereinabove and at Paragraphs 5 through 6, and suffered other related monetary damages.

174.   As a result of Defendant's aforesaid material misrepresentations and omissions, Plaintiffs are entitled to recover from Defendant their aforesaid damages and compensatory damages, together with costs and disbursements incurred herein.

## COUNT IV
### Constructive Fraud and Breach of Fiduciary Duty

175.   Plaintiffs restate and reallege paragraphs 1 through 174 hereinabove, as if fully stated herein.

176.   Defendant had a fiduciary relationship with and a duty of care to Plaintiffs. Because of his close friendship with Yary and Ken and Marion Resnick, and because of Braverman's close relationship with Marion and Ken Resnick, Defendant knew, or ought to have known, that Plaintiffs placed their trust and confidence in Defendant and relied on Defendant to protect and look out for Plaintiffs interests.  Defendant held himself out as sophisticated investor to Plaintiffs.  With respect to Ken and Marion Resnick, he induced them to make investments while giving them investment and financial planning advice.  He induced Braverman to ignore legal warnings regarding the extreme risk of the investment.  Defendant possessed much greater investment knowledge and experience than did Ken and Marion Resnick and Braverman, who were unsophisticated investors,

and had access to material and confidential information that none of the Plaintiffs had.

He held himself out as someone who had unique information regarding and access to

lucrative investment opportunities in making the aforesaid statements and

representations.  Furthermore, Defendant received pecuniary compensation related to his

inducement of Plaintiffs to invest and reinvest in Assured and Hennessey.  Because

Defendant omitted material facts regarding the financial and gain and other benefits he

received as a result of Plaintiffs' reliance on the aforesaid statements and representations,

including but not limited to the receipt of commissions and the waiver provision in the

Jaguar subscription agreement, Plaintiffs did not know that Defendant's interests were

adverse to Plaintiffs' interests.

 177. Defendant breached his fiduciary duty to Plaintiffs by making the aforesaid

statements and representations, and omitted material facts necessary to make the

statements and representations that were made, in light of the circumstances under which

they were made, not misleading, including the statements and representations referenced

in Paragraphs 155 through 162 hereinabove, including but not limited to Defendant's

misrepresentation of the high degree of risk associated with the Assured and Hennessey

investments.  The aforesaid statements, representations and material omissions were and

are highly unreasonable and involve extreme departures from any acceptable standard of

ordinary care, constituting a willful effort to mislead Plaintiffs into believing the

statements and representations, and in reliance thereon make their respective investments.

 178. As a direct and proximate result of Defendant's aforesaid breach of duties

to Plaintiffs, each of the Plaintiffs have been damaged in the respective amounts of their

principle investments and accrued interest, as set forth hereinabove and at Paragraphs 5

through 6, and suffered other related monetary damages.

179.    As a result of Defendant's aforesaid breach of duties to Plaintiffs, Plaintiffs

are entitled to recover from Defendant their aforesaid damages and compensatory

damages, together with costs and disbursements incurred herein.

## COUNT V
## Unjust Enrichment

180.    Plaintiffs restate and reallege paragraphs 1 through 183 hereinabove, as if

fully stated herein.

181.    By and through Defendant's aforesaid fraud, false pretenses, false

promises, misrepresentations, misleading statement and deceptions, Defendant has been

unjustly enriched.  Defendant knowingly received commissions or finder's fees for

Plaintiffs' investments and reinvestments with Defendant, Assured and Hennessey and

received interest payments and repayments of loans, profit distributions and other

pecuniary benefits from the companies in which Defendant induced Plaintiffs to invest.

182.    As a direct and proximate result of Defendant's unjust enrichment, each of

the Plaintiffs have been damaged in the respective amounts of their principle investments

and accrued interest, as set forth hereinabove and at Paragraphs 5 through 6, and suffered

other related monetary damages.

183.    As a result of Defendant's aforesaid unjust enrichment, Plaintiffs are

entitled to recover from Defendant their aforesaid damages, together with costs and disbursements incurred herein.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request entry of judgment against Defendant pursuant to the various Counts alleged herein, awarding Plaintiffs full monetary damages to be proved at trial, together with pre- and post-judgment interest, attorneys fees, costs and disbursements, all damages available pursuant to relevant law, and such other and further relief as the Court deems just and proper.

Dated this 21st day of March, 2011.

 s/Kevin M. Magnuson
Daniel M. Scott (#098395)
Kevin M. Magnuson (#306599)
Kelley, Wolter & Scott, P.A.
431 S. 7th Street, Suite 2530
Minneapolis, MN 55415
(612) 371-9090 (Tel.)
(612) 371-0574 (Fax)
kmagnuson@kelleywolter.com
dscott@kelleywolter.com

*Counsel for Plaintiffs*